**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

DEMOND HILL,

              Plaintiff,              :         Case No. 3:08 cv 195

    -vs-

AIRTRAN AIRWAYS, INC.,

              Defendant.            :         Magistrate Judge Michael R. Merz

---

## DECISION AND ORDER

---

       This case is before the Court on Defendant AirTran's Motion for Summary Judgment. The parties have fully briefed the issues (Doc. 27, 30, 32, 33) , and the matter is ripe for decision on the merits.

       The parties have unanimously consented to plenary magistrate judge jurisdiction and the matter has been referred on that basis.

       On May 13, 2008, Plaintiff Demond Hill ("Hill") filed this lawsuit in the Common Pleas Court of Montgomery County (Doc. 1-2) alleging that Defendant AirTran Airways, Inc. ("AirTran") had discriminated and retaliated against him on the basis of race in violation of Title VII of the 1964 Civil Rights Act and Ohio state law. Plaintiff also alleges claims of wrongful discharge and intentional infliction of emotional distress, asking the Court for punitive damages. This lawsuit was removed to federal court on June 11, 2008. (Doc. 1.)

       This Court has subject matter jurisdiction, which is not contested, under 28 U.S.C. §§ 1331 and 1343.

# SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). A fact is not material unless it is identified by the controlling substantive law as an essential element of a non-moving party's case. *Id.* at 248. Conclusory assertions, only supported by the plaintiff's own opinions, cannot withstand a motion for summary judgment. *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed. R. Civ. P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.

1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimis*. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

> The moving party
>
> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio*

*Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## STATEMENT OF UNDISPUTED FACTS

Baring in mind the principles discussed above, the facts in this case which generally are not in dispute are as follows.

Plaintiff worked as a customer service representative or customer service agent for Defendant AirTran Airways, Inc. ("AirTran") from September 2005 until being terminated effective April 13, 2007. (Complaint, Doc. 2, ¶ 3; Answer, Doc. 7, ¶12. ) During his time at AirTran, Hill was one of around four to five African-Americans working as customer service representatives at AirTran in Dayton. (Hill Dep. Doc. 26-3 at 4.) He worked on first shift from 4:00 a.m. to 1:00 p.m., making about $10 an hour plus commission when he was fired. (Hill Dep. Doc. 26-3 at 12.) His jobs as a customer service representative included checking-in customers, loading customer luggage, and trying to sell customers upgraded tickets. (Neely Dep. Doc. 26-59 at 16.) Hill was the leading salesperson of upgraded tickets. (Gamble Dep. Doc. 26-58 at 25.) Hill's immediate supervisor while

working at AirTran was Tim Thornton ("Thornton"), a Caucasian male who was the first shift supervisor over customer service representatives. (Thornton Dep., Doc. 31 at 7-9) Thornton's superior was the station manager, Linda Hughes ("Hughes"), an African-American female. (Hughes Dep., Doc. 26-60 at 8.; Hill Dep., Doc. 26-4 at 31.)

AirTran has a final warning letter in Hill's employee file dated July 11, 2006. This letter states that a final warning had been issued to Hill in response to an incident that day where he was observed in "a long, loud, and totally unprofessional confrontation with another crew member." (Hill Dep., Ex. 43, Doc. 26-53.) The letter also describes three additional instances where Hill was warned for arguing with co-workers. On March 11, 2006, Hill argued with his supervisor over his clock-in time because he had to run home to retrieve his forgotten identification badge. On March 12, 2006, Hill was overheard arguing with a co-worker in front of a passenger. And on March 19, 2006, Hill was reported arguing with a passenger regarding an infant traveling. *Id.* The letter warns that any further incidents may result in termination. *Id.* AirTran and Hughes claim that the letter was hand delivered to Hill's home address. Hill denies having received the final warning letter. (Hill Dep., Doc. 26-4 at 46.)

On June 11, 2006, in a memo relayed to AirTran Human Resources, Hill said Thornton and other AirTran customer service agents were biased toward him. (Hill Dep., Ex. 34, Doc. 26-44.) Hill never used the word discrimination or claimed the bias was race related. On November 9, 2006, Hill filed an internal report of alleged racial harassment regarding an incident that took place on November 4, 2006. In the report, Hill alleged that Thornton showed discrimination by unfairly implementing company rules on break times, on acceptable wardrobe, and on who was let off work early. The report said that on November 4, 2006, Thornton had raised his voice and "got in [Hill's]

face" during a discussion on wearing a hat at work.(Hill Dep., Ex. 8, Doc. 26-18 at 2.) AirTran found that the incidents reported by Hill did not constitute discrimination nor harassment, but Thornton's actions may have been perceived as offensive. Thornton was issued a written warning and was told that any further inappropriate actions could be grounds for termination. (Hill Dep., Ex. 25, Doc. 26-35 at 1.)

AirTran fired Hill after the events of April 10, 2007. On April 10, 2007, Hill took at least a fifteen-minute break during the "early morning operations" ("EMOs"). EMO is a term referring to the three flights leaving the Dayton airport between 6 a.m. and 8 a.m. The three flights left near or around 6:00 a.m., 7:00 a.m., and 8:00 a.m. Hill was assigned as the primary ticket counter agent on duty for all three flights. His fellow customer service representatives Melissa Beard, Brandon Fenton, and Henry Chaffin were all assigned to the ramp. This meant that they were to assist Hill at the ticket counter and then return to the ramp at cut-off time, 30 minutes before departure, to load bags on the plane. (Hill Dep. Doc. 26-3 at 43-48.) All customer service representatives were trained for the ticket counter and the ramp.

Hill took a break around 6:15 a.m. to get coffee, 15 minutes before the cut-off time for the 7:00 a.m. flight. When he returned, he did not help his co-workers check in any more bags for the 7:00 a.m. flight saying he "was on a break." (Hill Dep., Doc. 26-3 at 54; Fenton Dep., Doc. 26-57 at 17; Chaffin Dep., Doc. 26-55 at 25.) Hill returned to checking in bags for the 8:00 a.m. flight at approximately 6:30 a.m. (Hill Dep., Doc. 26-3 at 55.) After Hill checked in the 8:00 a.m. flight alone, he called Thornton to complain that neither Fenton nor Chaffin helped with the 8:00 a.m. flight's check-in. (Hill Dep., Doc. 26-3 at 55-59.) Thornton responded to the complaint by saying he would address the situation later. Hill then confronted Beard, Fenton and Chaffin in the bag

room.  He reported this confrontation in the bag room to Thornton with a second phone call.  (Hill

Dep., Doc. 26-7 at 27.)  After Thornton heard of this confrontation, he contacted Beard, Fenton, and

Chaffin to have them write statements for Human Resources.  Thornton also reported the incident

to Hughes by email.

Hughes met with Hill around 11:00 a.m. on April 10, 2007, and told him he was suspended

then recommended to Human Resources that Hill be terminated.  When Hill returned home that day,

he wrote Hughes an email restating the day's events and complaining about what he perceived to

be Thornton's racial mistreatment of him.  Before making her recommendation, Hughes also

received the email from Thornton saying that he would not tolerate Hill's behavior and that Hill

should be reprimanded. (Hughes Dep., Doc. 26-61 at 30-31.)  Human Resources reviewed Hughes'

recommendation and terminated Hill's employment in a letter sent April 13, 2007.  (Ex. 1 of Hughes

Dep., Doc. 26-62 at 1.)  In this letter, Hill was told his termination was the result of the April 10,

2007, incident and four previous written reprimands. (Ex. 1, Doc. 26-62 at 1.)  Fenton and Chaffin

were giving written warnings for not returning to the counter on April 10, 2007, to help check in the

8:00 a.m. flight.

AirTran's employee manual says that AirTran is "committed to providing equal employment

opportunities to all qualified Crew Members and applicants for employment without regard to race,

color, religion, sex . . . .  In addition AirTran Airways complies with applicable state law governing

nondiscrimination in employment . . . ." (Ex. 1, Doc. 26-10 at 15.)  The "Policy Against Harassment

Section" of the manual says that harassment related to race or color is prohibited and will be grounds

for disciplinary action up to and including termination.  Harassment is defined by the manual as

"Any conduct or language directed toward another crew member that is unwelcome or is offensive

based upon the individual's race, color . . . ." OR "Conduct that has the effect or purpose of unreasonably interfering with an individual's work performance or creating an uncomfortable, intimidating, hostile or offensive working environment." (Ex. 1, Doc. 26-10 at 15.) AirTran also expressly prohibits retaliation against any person filing a complaint of harassment or against any person participating in an investigation. *Id*. at 17.

In addition to the AirTran Airlines official employee manual, the AirTran department in Dayton developed a section referred to as "Dayton's Four Step Process." (Ex. 3, Doc. 26-62 at 3.) This addition was a guideline used by Dayton AirTran management to deal with disciplinary issues, where each issue (bag tagging, uniform violations, insubordination, etc.) would be addressed with its own four-step process. When a violation occurred, Step One is to assess whether the employee was trained in the area in which they violated a rule. If the employee was trained, management would proceed to Step Two. If the employee was not trained, management took the opportunity to give him the proper training. Step Two provides that a written warning will be placed in the employee's file. Step Three is suspension without pay for one to three days. Step Four could be termination. *Id.*


**Parties' Claims**

Hill claims that Thornton discriminated against him during his time at AirTran because Hill was black. Hill claims that: (1) Thornton inconsistently applied workplace rules to white employees and black employees; (2) Thornton allowed white employees to wear hats while working the ramp but told Hill wearing hats was prohibited; (3) Thornton freely gave breaks to white employees in contrast with his treatment of black employees' breaks; (4) Thornton also allowed white employees

to eat at the ticket counter, something he did not allow Hill to do; (5) Thornton limited the times Hill would work the ticket counter, cutting the opportunities he had to sell upgrades and earn commission. (Hill Dep., Doc 26-4 at 36-37, 44-45.)

AirTran denies that Thornton treated Hill differently than the other customer service representatives. AirTran alleges that: (1) hats were prohibited by the employee handbook; (2) employees wanting to take breaks did so at the discretion of their supervisor; (3) eating at the ticket counter was always prohibited; (4) the duties of customer service representatives were assigned with input from all three supervisors, and not only Thornton.

Hill claims that he is a highly qualified customer service representative, and that he continuously led the staff in selling upgraded tickets. Aaron Neely ("Neely") testified that Hill's work performance throughout his employment was exceptional. (Neely Dep., Doc. 26-59 at 18-19.)

Another African-American customer service representative, Neely, testified that he also felt Thornton treated African-American employees differently than whites. (Neely Dep., Doc. 26-59 at 25-43.) Neely deposed that there was always a tension between Thornton and Hill. "It was obvious there was a dislike between [Thornton and Hill]." *Id.* at 21-22. Neely testified that he thought Thornton would "ride" certain employees he did not like by assigning them jobs they did not want. *Id.* at 22, 25, 31, 43. Neely testified that a lot of his perceived discriminatory treatment was directed toward the black employees. *Id.* at 25-26.

Hill said that during a November 4, 2006, incident, Thornton got "in his face" after Hill asked a question on whether he could wear a hat at work. (Ex. 8, Doc. 26-18 at 2.) Hill claims that Thornton challenged him to file a charge against him during the confrontation. (Hill Dep., Doc. 26-4 at 32, 41; Gamble Dep., Doc. 26-58 at 38.)

Hill testified that when he voiced his concerns regarding the November 4, 2006, incident and Thornton's discrimination to Hughes, she begged him to keep the complaints "in house" and even cautioned Hill that he could be fired for complaining. *Id.* at 32-34. Hill believes that Hughes was trying to deter him from complaining to AirTran's Human Resource department. *Id.* at 6. After Hill filed his complaints with AirTran Human Resource office on November 4, 2006, he testified that Thornton retaliated against him by assigning him to ramp duties more often. This negatively affected Hill's income because he had less opportunity to sell upgraded tickets for commission. *Id.* at 54-57.

AirTran claims that Hill was issued a final warning letter dated July 11, 2006. (Ex. 43, Doc. 26-53.) Although this letter appears in Hill's employee file, he claims to have never seen nor received it. Hill claims that if AirTran would have issued him a final warning letter, his signature would appear on the document, which it does not. (Hill Dep., Doc. 26-4 at 46.) AirTrain claims that the letter was hand delivered to Hill and the letter states it was hand delivered. (Ex. 43, Doc. 26-53.)

On the morning of April 10, 2007, Hill took a break around 6:15 a.m., in the middle of the EMOs. Hill claims he told two of his fellow workers, Fenton and Chaffin, that he was leaving the counter to take a break. He claims there were only two passengers left in line waiting to be checked in for the 7:00 a.m. flight and that Fenton and Chaffin had the ticket counter under control. (Hill Dep., Doc. 26-3 at 52.) Fenton and Chaffin both testified that they returned to the ticket counter at around 6:15 a.m. to find that Hill had left to take a break. They both deny that Hill alerted them of his break. When Hill returned to the ticket counter around 6:30 a.m., Hill, Fenton, and Chaffin all recall him sitting behind the ticket counter drinking his coffee. (Hill Dep., Doc. 26-4 at 54; Chaffin Dep., Doc. 26-55 at 31-32.) Hill said he was continuing his 15-minute allowed break and that the

line of passengers was maintainable by Fenton and Chaffin. Hill returned to his post at the ticket counter around 6:30 a.m., at which time, Fenton and Chaffin left and returned to the ramp.

Hill claims that customer service representatives working the ticket counter were allowed to take 15-minute breaks during EMOs as long as they got their fellow employees to cover the ticket counter. He said that as long as the line of passengers was low and the ticket counter was covered, 15-minute breaks during EMOs were not prohibited. However, Thornton and Hughes testified that breaks during the flight check-in and take-off process – particularly during the EMOs – were not allowed nor considered standard practice. (Thornton Dep., Doc. 31 at 13; Hughes Dep., Doc. 26-60 at 40.)

After the 7:00 a.m. flight departed, Fenton and Chaffin said they returned to the bag room and sat down to take a rest. Hill testified that after he checked in the entire 8:00 a.m. flight, he called Thornton to inform him of Fenton and Chaffin's absence. According to Hill, Thornton responded by saying if Hill could take a 30-minute break, so could Fenton and Chaffin. (Hill Dep., Doc. 26-4 at 57-58.) Thornton told Hill they would discuss the matter at a later time. Hill then confronted Fenton and Chaffin in the bag room telling them not to expect his help the next time they were working the ticket counter. Hill again called Thornton to tell him of the confrontation. According to Thornton and a written account of the incident, Hill ended the conversation by slamming the phone on Thornton. (Hughes Dep, Doc. 26-62 at 5.) Hill denies slamming the phone or hanging up on Thornton. (Hill Dep., Doc. 26-3 at 26.) After the second phone call, Hill, Fenton, and Chaffin all gave written statements to Hughes upon her request. Hughes said she received conflicting versions of the incident on April 10, 2007. (Hughes Dep., Doc. 26-60 at 31-32.) According to Hill, Hughes suspended him for insubordination because he hung up on Thornton. *Id.*

at 26. Hughes testified that his suspension and ultimate termination were due to the culmination of multiple write-ups and ongoing interpersonal conflicts Hill had with other employees. (Hughes Dep., Doc. 26-60 at 15-16.)

During the meeting on April 10, 2007, Hill said that Hughes fired him while saying "I'm tired of you and [Thornton], I'm tired of your complaints against [Thornton]." (Hill Dep., Doc. 26-3 at 26.) Hill claims that Hughes told him in that meeting that she knew he would be back in her office with another conflict within a week and she was sick of his complaints. *Id.* at 26. Hughes admits that she was annoyed by Hill's constant complaints, but this was not the deciding factor in her recommendation to Human Resources that he be fired. (Hughes Dep., Doc. 26-60 at 15-16.) Hughes claims that the final warning letter in Hill's file helps show that the April 10, 2007, incident was the last in a long line of problems Hill had at AirTran. (Hughes Dep., Doc. 26-60 at 15.)

Hill claims that Thornton gave an order to Hughes to reprimand Hill after the April 10, 2007, incident and it was this order that led her to recommend his termination. (Pl.'s Mem. In Opp'n To Summ. J., Doc. 30 at 7.) Hughes testified that Thornton had no impact on her decision to recommend termination. (Hughes Dep., Doc. 26-60 at 15-18.) Hughes testified that she was aware Hill had filed an internal claim of race discrimination against Thornton and that Hill had reported multiple instances where he perceived Thornton was treating him different because of race. (Hughes Dep., Doc. 26-61 at 3-6.)

**I. TITLE VII CLAIMS**

**A) CLAIM I: RACE DISCRIMINATION**

Title VII prohibits an employer from discriminating against an employee, with respect to the terms, conditions, and privileges of one's employment, on the basis of race or color. *See* 42 U.S.C.

§ 2000e-2(a)(1); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 63 (1986). Ohio Rev. Code § 4112.02(A) prohibits the same conduct as a matter of State law, and is generally construed in identical fashion to Title VII. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128 (Ohio 1981); *Blankenship v. BMI Refractories*, 966 F. Supp. 555, 557 (S.D. Ohio 1997).

*McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), set the basic allocation of burdens and order of presentation of proof in a Title VII cases. First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *Id.* at 802. Although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (U.S. 1981). Third, if the defendant meets this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons for termination were not the employer's true reasons, but were a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804.

## 1) Plaintiff's *Prima Facie* Case of Race Discrimination

To succeed in showing a *prima facie* case of race discrimination, the plaintiff must show that he:(1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *DiCarlo v. Potter*, 358 F.3d 408, 414

(6th Cir. 2004). It is undisputed that Hill meets the first two elements of the *prima facie* case: he is African-American and he was terminated. Element three, whether he was a qualified customer service representative, is a bit unclear. Hill's fellow employees and his manager, Hughes, said Hill was the leading customer service representative when it came to selling upgrades. However, Hill did have a history of problems with his co-workers, supervisors, and a customer. The Plaintiff has raised genuine issues of material fact regarding Element Three and this analysis will assume Plaintiff has met his burden as to Element Three.

To satisfy Element Four, Hill must prove that he was replaced by someone outside of his protected class or was treated differently than similarly-situated, non-protected employees. *Id.* To survive defendant's motion for summary judgment, Hill must proffer sufficient evidence to create a genuine issue of material fact regarding Element Four, something he has failed to do.

In Plaintiff's Complaint, he alleges that he was terminated and replaced by a white employee. However, Plaintiff provides the Court with no evidence that such a hire was made. Further, the Plaintiff does not address this issue in his memorandum to the Court. (Doc. 30.) Hughes testified that hires were not made to specifically replace employees who were terminated or left Dayton AirTran. Instead, when there was help needed among customer service representatives, either when an employee was terminated, resigned, or workload increased to warrant a new hire, the process of bringing in addition staff was started. Hughes said hiring new employees was a process and that identifying who was hired to replace Hill was hard to determine. (Hughes Dep, Doc. 26-61 at 10-13.) Neely also testified that he was unsure who was hired after Plaintiff was terminated. (Neely Dep., Doc. 26-59 at 20-23.) In Defendant's Response to Plaintiff's First Interrogatories (Doc. 26-63), AirTran reiterates that no one person was responsible for the replacement of Demond Hill and

that the next customer service representative hired was a black male. (Doc. 26-63 at 4-5.) When evaluating the evidence in the light most favorable to the non-moving party, Plaintiff's allegation that he was replaced by a white employee is not grounded in sufficient evidence to create a genuine issue of material fact.        The Plaintiff does not raise genuine issues of material fact that he was treated differently than similarly situated, non-protected employees.  In *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), the court said to be deemed "similarly-situated," the individuals with whom the "plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

There were two co-workers directly involved in the altercation with Plaintiff on April 10, 2007, Henry Chaffin and Brandon Fenton.  Plaintiff, Chaffin, and Fenton all dealt with Thornton as their primary supervisor on first shift and all three were employed as customer service representatives with identical responsibilities.  However, Fenton started working at AirTran around April 4, 2007. (Fenton Dep., Doc. 26-57 at 7.)  Hughes said her decision to recommend Hill for termination was largely based on his disciplinary background, which consisted of at least four written warnings and many additional confrontations with co-workers.  Hughes also noted that a final warning letter was placed in Hill's employee file on July 11, 2006.

Because Fenton had only been working at AirTran for about two weeks, he did not have a discipline record at the time of the April 10, 2007, incident.  He was given a verbal warning and a written warning was placed in his employee file for not returning to the counter to assist Hill on April 10, 2007.  Fenton's lack of a disciplinary record prevents his being "similarly situated" to Hill.

Chaffin had been working at AirTran for over a year as of April 10, 2007. Before the April 10, 2007, incident, Chaffin was given three warnings for bag check errors, one written warning for an untimely deposit, one verbal warning for missing a shift, and one warning for an incomplete fuel log. (Def.'s Resp. To Pl.'s First Interrogs, Doc. 26-63 at 6.) Chaffin was also given a verbal and written warning placed in his employee file for not returning to the counter to assist Hill on April 10, 2007. AirTran has no documented cases of Chaffin being warned for altercations with co-workers or customers prior to April 10, 2007. Unlike Fenton, Chaffin did have a disciplinary record prior to April 10, 2007. However, his record consisted of non-confrontational type errors like mis-tagging a bag and an untimely deposit of money. Hughes testified that Hill's history of confrontations with co-workers and customers was what led her to recommend Hill's termination. Chaffin's disciplinary record being free from any past acts dealing with confrontations, prevents his being "similarly situated" to Hill.

When construing the facts presented in the light most favorable to Plaintiff, he has failed to raise genuine issues of material fact that he was treated differently than similarly situated, non-protected employees. Therefore, Plaintiff has failed to meet his burden under Rule 56 regarding his *prima facie* case because he has failed as to Element Four. Because Plaintiff cannot adequately support his *prima facie* case, there is no need for this Court to analyze whether Plaintiff's termination was based on legitimate non-discriminatory reasons, or if these reasons were pretext for race discrimination. Defendants Motion for Summary Judgment is granted in regards to Plaintiff's First Claim of Race Discrimination, or Count I as indicated on Plaintiff's Complaint (Doc. 2). The claim of Race Discrimination is dismissed.

**B) CLAIM II: RETALIATION**

Plaintiff alleges a cause of action for unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 and O.R.C. § 4112.02(I).

## 1. Plaintiff's Prima Facie Case of Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must establish that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). To establish the fourth element of a causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Id. See also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984).

Plaintiff alleges that after complaining to Hughes about Thornton's conduct possibly being discriminatory, that Thornton assigned him to increased ramp duty depriving him of increased commissions. Plaintiff also filed a complaint with the Human Resources department of AirTran complaining of an incident that happened November 9, 2006. Plaintiff was terminated on April 13, 2007, following the incident on April 10, 2007.

Plaintiff satisfies Element One and Element Two. The verbal complaints to Hughes and the internal complaint to Human Resources are protected activities under Title VII, in addition to being identified by the AirTran employee manual as avenues for dealing with discriminatory treatment. Hughes was the manager dealing with the majority of Plaintiff's complaints. Hughes also testified that she was alerted to the complaint made to Human Resources.

17

Element Three is satisfied by the Plaintiff's termination on April 13, 2007. The adverse action alleged by the Plaintiff's Complaint (Doc. 2) and again by Plaintiff's Memorandum in Opposition to Summary Judgment (Doc. 30) was Hill's termination. This Court will analyze the fourth element of a causal connection only between the complaints made by Plaintiff and his termination. This Court will not analyze any causal connections between complaints made by Plaintiff and what Plaintiff believed to be harsher treatment by Thornton, because the Plaintiff apparently has abandoned this argument in his memoranda to the Court.

Just because an adverse employment action follows protected activities does not mean there is a causal connection. *See Nguyen*, 229 F.3d at 566-67. To establish a causal link, a plaintiff is required to proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action. *EEOC*, 104 F.3d at 861. To survive Defendant's Motion for Summary Judgment, Plaintiff must raise genuine issues of material fact that his complaints to Hughes and his complaint to Human Resources were what prompted his termination and that without his complaints, he would not have been fired.

Plaintiff has failed to meet his burden in regards to Element Four. He has not provided this Court with evidence that his termination was a result of complaints about discrimination. The only evidence supporting Plaintiff's allegations that his termination was retaliation is the Plaintiff's personal feelings in the matter. In contrast, the Defendant has provided the court with ample evidence that Hill's termination was the result of multiple disciplinary actions that involved confrontations with co-workers other than Thornton, and a confrontation Hill had with a AirTran customer. A final warning letter was placed in Hill's employee file. This letter shows that the confrontation Hill had with Thornton, Chaffin, and Fenton on April 10, was just the last straw in a

long line of misconduct. It was this long line of conduct and not Hill's constant complaining that weighed on Hughes' mind when she recommended Hill's termination.

The *Nguyen* Court found that an employee discharge happening "soon after" engaging in a protected activity was indirect proof of a causal connection because it strongly suggested retaliation. *Nguyen*, 229 F.3d at 563. Hill was fired almost five months after he complained to Human Resources. The five month time period is evidence to be considered by the court when deciding if the Plaintiff has raised genuine issues of material fact regarding a causal connection. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses . . . the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.") The Plaintiff cannot use the temporal proximity of five months alone as indirect proof of a causal connection. He must offer further proof to establish causality.

The Plaintiff documents numerous times when he believes Hughes was acting in a retaliatory manner. While suspending Plaintiff on April 10, 2007, Hughes said she "bet" Plaintiff would be back in her office again within 30 days with more complaints. (Hughes Dep., Doc. 26-61 at 19.) Plaintiff also recalls times where Hughes showed her displeasure with his constant complaints. (Hill Dep., Doc. 26-3 at 26.) Plaintiff claims this shows Hughes and AirTran were retaliating against his complaints by firing him; and this alleged mentality is reason to find a causal connection between his termination and his protected activity. However, the Plaintiff still has the burden to produce genuine issues of material fact that show that his protected activity was a significant factor in the

employer's adverse action. *Mickey*, 516 F.3d at 527. The Plaintiff has failed to satisfy this burden.

Plaintiff not only alleges retaliation for his November 9, 2006, complaint to Human Resources, but also for his internal complaints to AirTran's manager, Hughes. Hughes does not deny that she was frustrated with Plaintiff because of his complaints. However, Hughes was clear in her deposition that it was the Plaintiff's body of disciplinary actions that led her to recommend his termination. Hughes was frustrated because Plaintiff always had "an apparent enemy." (Hughes Dep., Doc. 26-61 at 19.) Plaintiff further alleged that everyone at Dayton Airtran, except for three fellow employees, was prejudiced against him, which led them to lie about him to Thornton. (Hill Dep., Doc. 26-8 at 21-23.) Hughes testified that her recommendation for Plaintiff's termination was the result of his not getting along with many co-workers, both Caucasian and African-American. She noted that Hill was in her office on what seemed like a weekly basis with another disciplinary action or complaint, dealing with co-workers other than Thornton as well as AirTran customers. (Hughes Dep., Doc. 26-61 at 16-19; *see also*, Hill Ex. 29, Doc. 26-39, showing a conflict with supervisor Nancy Brumfield regarding clock in time; Ex. 30, Doc. 26-40, showing two incidents of conflict between Plaintiff and Brumfield, and Plaintiff and co-worker Lauren Bruss; Ex. 33, Doc. 26-43, showing a problem at the ticket counter that a co-worker attributes to Plaintiff yelling at a co-worker in front of customers; Ex. 35-41, Doc. 26-(45-51), showing an incident involving a yelling outburst between Plaintiff and a fellow employee; Ex. 43, Doc. 26-53, final warning letter to Plaintiff further documenting history of discipline.) Hughes only took into account the April 10, 2007, confrontation with Thornton as another incident in a long line of incidents dealing with co-workers. Plaintiff was not terminated with a retaliatory animus for his constant complaints to Hughes. He was terminated because he was a constant distraction and disruption at Dayton AirTran.

Plaintiff has failed to produce evidence to the contrary. The only evidence supporting Plaintiff's allegation that he was retaliated against is his own personal feelings toward the situation. "Conclusory assertions, supported only by Plaintiff's own opinions cannot withstand a motion for summary judgment." *Arendale*, 519 F.3d at 605, citing *Travelodge Hotels, Inc. V. Govan*, 155 Fed. Appx. 235, 237 (6th Cir. 2005). Plaintiff supports his retaliation allegation only with his own testimony stating his personal opinion that he was the victim of retaliation. The evidence produced to this Court is not sufficient for the Plaintiff to withstand a motion for summary judgment.

When looking at the facts presented in the light most favorable to the Plaintiff, he has failed to meet his burden under Rule 56 regarding his *prima facie* case of retaliation because he has failed to produce sufficient evidence from which a jury could find causation. Because Plaintiff cannot adequately support his *prima facie* case and Element Four, there is no need for this Court to analyze whether Plaintiff's termination was based on legitimate non-retaliatory reasons or if these reasons were pretext for race discrimination. Defendants Motion for Summary Judgment is granted in regards to Plaintiff's second claim of Retaliation, or Count II as indicated on Plaintiff's Complaint (Doc. 2).

## II. STATE CLAIMS

## A) CLAIM III: WRONGFUL DISCHARGE

In Count III of his Complaint, Plaintiff alleges that AirTran wrongfully discharged him in violation of Ohio public policy. In order to establish a claim for wrongful discharge in violation of Ohio public policy the Plaintiff must prove four elements: (1) a clear public policy existed and is manifested in a statute, regulation, or common law (the "clarity" element); (2) discharging an employee under circumstances like those involved would jeopardize the policy (the "jeopardy"

element); (3) that the discharge at issue was motivated by conduct related to the policy (the "causation" element); and (4) that there was no overriding business justification for the discharge (the "overriding business justification" element). *Collins v. Rizkana* 73 Ohio St.3d 65, 70; *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 151. Elements One and Two are questions of law and policy to be determined by the court. *Collins,* 73 Ohio St.3d at 70. Elements Three and Four are questions of fact to be determined by the trier of fact. *Id.* However, Plaintiff's Memorandum in Opposition to Summary Judgment states that the Court is not to consider Elements Three and Four in the context of a Summary Judgment Motion because they are fact intensive issues only to be decided by a jury. (Pl. Mem. In Opp'n to Summ. J., Doc. 30 at 22.) However, under Rule 56, if the Plaintiff cannot produce "genuine issue as to any material fact, [] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. All four elements of a wrongful discharge claim, as laid out by the *Kulch* court, will be evaluated for the analysis of Defendant's Motion for Summary Judgment.

Plaintiff satisfies Element One because he is suing for retaliation and race discrimination under O.R.C. § 4112.02. The State of Ohio has a clear public policy interest in protecting employees against retaliation and race discrimination; and the state's interest is manifested in the Ohio Revised Code and 42 U.S.C. § 2000e, *et seq.*

Plaintiff also satisfies Element Two because if he was fired in retaliation for his race discrimination complaints, Title VII and § 4112.02 of the O.R.C. and their protection of public policy would be in jeopardy. The Ohio Supreme Court views employee complaints about race discrimination critical to the enforcement of the State's public policy. "The 'jeopardy' element does not state simply that the policy has been violated, but that the policy itself is at risk if dismissals like

the one in question are allowed to continue." *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659 (6th Cir. 2005). If termination of employees in retaliation to discriminatory complaints are allowed to continue, the State's public policy would be at risk.

Plaintiff has failed to produce sufficient evidence concerning Element Three. Element Three of the Wrongful Discharge Claim, the "causation" element, mirrors that of the causation element for the Retaliation Claim. For reasons stated above, Plaintiff has failed to meet his burden under Rule 56 regarding Element Three. Defendants Motion for Summary Judgment is granted in regards to Plaintiff's third claim of Wrongful Termination, or Count III as indicated on Plaintiff's Complaint (Doc. 2). The claim of Wrongful Termination is dismissed.

## B) CLAIM IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Count IV of his Complaint, Plaintiff alleges that AirTran's termination of his employment caused him serious emotional distress. The alleged injuries include "sleepless nights, stress, and being in an economic bind." (Hill Dep., Doc. 26-9 at 18.)

To recover on his Intentional Infliction of Emotional Distress (IIED) claim, Hill must show that (1) AirTran intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress; (2) that AirTran's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;(3) that AirTran's conduct was the proximate cause of his alleged psychic injuries; and (4) that his emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *Ekunsumi v. Cincinnati Restoration*, 120 Ohio App. 3d 557, 561 (1st Dist..1997). Under Ohio law, "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

23

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Yeager v. Local Union 20, Teamsters*, 453 N.E.2d 666, 670 (Ohio 1983). Liability will not be found in instances where the Plaintiff merely has hurt feelings. IIED is not in place to protect against "insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* IIED claims are ones "which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.*

## 1. Extreme and Outrageous Conduct Considered as Utterly Intolerable in a Civilized Community

Plaintiff's Memorandum in Opposition to Summary Judgement (Doc. 30) inadequately supports Plaintiff's IV Claim of IIED. Plaintiff claims that "the manner and method in which Plaintiff was fired, and the fact AirTran singled out Plaintiff for termination (and only reprimanded other similarly culpable CSA's) is something that a jury could reasonably conclude is utterly intolerable in the workplace." (Pl.'s Mem. In Opp'n to Summ. J., Doc. 30.)

When viewing all evidence in a light most favorable to the Plaintiff, no reasonable juror could conclude that AirTran's actions were outrageous and consider AirTran's actions as "utterly intolerable in a civilized community." *Ekunsumi,* 698 N.E.2d at 505. Plaintiff was never called a racially derogatory name and was never threatened with physical violence. Plaintiff's alleged discriminatory conduct was Thornton making him work the ramp more often, not giving him permission to take breaks at certain times, and not allowing him to wear a hat at work, all of which could be seen as conditions of his job. The alleged discriminatory conduct stated in Plaintiff's Memorandum does not rise to the level of extreme or outrageous conduct. On one occasion, Thornton got close to Plaintiff's face and yelled at Plaintiff in front of other employees. This was

an isolated incident which Plaintiff reported through a formal process to Human Resources. (Ex. 8, Doc. 18.) Plaintiff never alleged that he was scared or felt physically threatened during the confrontation. The incident was investigated by AirTran, and although it was found to be unprofessional and unacceptable conduct, was not found to be discriminatory. This incident at most would be found to be an insult or an indignity, neither of which would constitute the incident as outrageous or extreme. *Yeager*, 453 N.E.2d at 670; *See also Mendlovic v. Life Line Screening of Am., Ltd.*, 173 Ohio App. 3d 46 (Ohio Ct. App.2007) (holding that a supervisor "barking" at employee, yelling at employee, not allowing vacation time for employee, and terminating employee does not rise to the level of outrageous conduct); *Kocijan v. S & N*, 2002 Ohio 3775, P71 (8th Dist..2002) (holding that an employer belittling an employee once in front of a customer, swearing at an employee in a customer's presence, and graphic language used by an employer in an employees presence did not rise to the level of outrageous conduct).

The manner in which Plaintiff was terminated would also not cause a reasonable juror to say "outrageous." Plaintiff was asked to write a statement of the events of April 10, 2007, as he saw them take place, and then was told by Hughes he was suspended. He was escorted to his car by security and received a letter three days later notifying him of his termination. All evidence presented to this Court shows the termination process of Plaintiff was done in an appropriate and professional manner.

Plaintiff's memorandum also relies on his retaliation claim to prove his IIED claim. This Court has dismissed the retaliation claim and subsequently rejects the IIED claim based on retaliation.

**2. Emotional Distress Serious and of Such a Nature That No Reasonable Person Could Be**

**Expected to Endure It**

Plaintiff also fails to show evidence that the emotional distress he received from alleged discriminatory conduct and his termination is "serious and such a nature that no reasonable person could be expected to endure it." *Ekunsumi,* 698 N.E.2d 503, 505. Plaintiff deposed that he has suffered "sleepless nights, stress, [and has been] an economic bind." (Hill Dep., Doc. 26-9 at 18-20.) Plaintiff contends that these ailments show the emotional distress he has suffered. *Id.* Plaintiff has also not seen a doctor regarding his emotional distress. *Id.* There also is no medical evidence, or non-medical evidence, of Plaintiff's emotional distress other than his own testimony. *Id.*

The distress the Plaintiff claims does not constitute serious distress that no reasonable person could be expected to endure. Plaintiff also had filed for bankruptcy at a date far before his termination from AirTran. Therefore, he cannot contend being in an economic bind as a new developing ailment attributable to his allegation against AirTran.

When viewing all evidence in a light most favorable to the Plaintiff, no reasonable juror could conclude that sleepless nights and stress constitute serious emotional distress under Ohio common law. Because Plaintiff has failed to meet his burden under Rule 56 regarding his fourth claim of Intentional Infliction of Emotional Distress, Defendant's Motion for Summary Judgment is granted and Plaintiff's IIED claim dismissed.

## III. CLAIM V: PUNITIVE DAMAGES

Because Summary Judgment has been granted as to Claims I-IV, no issues remain that would grant Plaintiff punitive damages. Accordingly, Summary Judgment is granted for Claim V, referred to as Count V in the Defendant's Complaint, and Plaintiff's claim for Punitive damages is dismissed

**Conclusion**

There are no genuine issues of material fact and Defendant entitled to judgment as a matter of law. The Clerk will enter judgment dismissing this case with prejudice.

June 19, 2009.

s/ **Michael R. Merz**
United States Magistrate Judge